IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| FORREST SCOTT SMART,<br><br>Plaintiff,<br><br>vs.<br><br>LEROY KIRKEGARD, et al.,<br><br>Defendants. | CV 15-00087-H-DLC-JTJ<br><br><br>FINDINGS AND RECOMMENDATIONS OF<br>UNITED STATES MAGISTRATE JUDGE |

Plaintiff Forrest Smart filed a Complaint pursuant to 42 U.S.C. § 1983 alleging various violations of his constitutional rights during his incarceration at Montana State Prison ("MSP") and at the Department of Corrections Lewistown Infirmary. (Doc. 2.) Pursuant to the screening mandated by 28 U.S.C. §§ 1915, 1915A, the undersigned issued an Order on April 4, 2016 finding that all claims raised in the Complaint failed to state a claim except Mr. Smart's claims against Defendants Fraiser and Foster regarding maintenance work done on August 14, 2014. Mr. Smart was given an opportunity to amend his Complaint. (Doc. 8.) On June 13, 2016, Mr. Smart filed a notice indicating he wished to proceed with only his Eighth Amendment and Fourteenth Amendment Equal Protection claims regarding maintenance work on August 14, 2014 as alleged in Count II of his Complaint. (Doc. 13.)

1

All other claims were recommended for dismissal pursuant to Rule 41 of the Federal Rules of Civil Procedure and Defendants Greg Fraiser and Crystal Foster[1] were served with Mr. Smart's claims regarding maintenance work on August 14, 2014. (Doc. 14.)

Defendants Fraiser and Foster have now filed a Motion for Summary Judgment arguing there are no genuine disputes of facts material to Mr. Smart's remaining allegations and that they are entitled to judgment as a matter of law. (Doc. 28.) Mr. Smart has responded and opposes the motion. (Doc. 32.)

The Court finds that there is no genuine dispute as to any material fact that precludes the issuance of summary judgment in this case. Defendants' motion should be granted.

**I.      MOTION FOR SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

---

[1] In Defendants' Motion for Summary Judgment (Doc. 28), Crystal Foster is referred to as Crystal Thompson (formerly Foster). In all other filings she is referred to as Defendant Foster. For purposes of this Order she will be referred to as Defendant Foster.

2

2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates

3

that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 447 U.S. at 248.

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966

(9th Cir. 2011). But it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notice provided April 14, 2017 (Doc. 31), Mr. Smart was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. FACTS[2]

In 2008, while a resident at MSP, Mr. Smart contracted the flu and pneumonia simultaneously. (Defendants' Statement of Undisputed Facts, Doc. 30 ("SUF") at ¶ 2.) The two illnesses left him hospitalized and his lungs became colonized with Methicillin-resistant Staphylococcus aureus (MSRA). As a result, he developed chronic obstructive pulmonary disease. (SUF at ¶ 3.) After the

---

[2]The facts taken from Defendants' Statement of Undisputed Facts (Doc. 30) are deemed undisputed unless contradicted elsewhere in the record. Mr. Smart failed to file a statement of disputed facts as required by Local Rule 56.1(b). *See* L.R. 56.1(d)("Failure to file a Statement of Disputed Facts will be deemed an admission that no material facts are in dispute.")

incident in 2008, Mr. Smart described his breathing as follows: "it takes quite a bit of effort for me to be able to breathe, to draw any breath, and my lungs doesn't process oxygen as well." "Back then, right after I got out of the – got out of the hospital, without oxygen I'd start to black out within a few minutes." (SUF at ¶ 4.) Mr. Smart explained that his lung condition is expected to get "worse over time." (SUF at ¶ 5.) Shortly after going on oxygen in 2008, Mr. Smart recalled an incident where his breathing issues left him immobilized and he was unable to use his voice to call for help: "My – very – well it was hard to draw breath to be able to speak." (SUF at ¶ 6.)

In August 2012, Mr. Smart was housed at MSP in High Side Unit 2, Cell Block B (HSU-2 B), Room 12. (SUF at ¶ 1.) On August 12, 2014, HSU-2 B was locked down while a table and stools were removed from the day room, outside of Mr. Smart's cell. (SUF at ¶ 7.) The table and stools that were removed were concrete with metal plates at the bottom. (SUF at ¶ 9.) The metal plates at the bottom of the table and stools were stich-welded to metal plates in the floor of the dayroom. (SUF at ¶ 10.)

The maintenance worker removing the table and stools used a grinder to "grind around the entire perimeter of the – table and the base of the – the stools." (SUF at ¶ 13.) Mr. Smart believes the maintenance worker might have been

6

wearing safety glasses, but did not wear any other safety equipment. (SUF at ¶ 12). The table being removed was directly outside Mr. Smart's door. When the grinding started, sparks came under Mr. Smart's door. (SUF at ¶ 14.) This resulted in dust, sparks, and other particles flowing under Mr. Smart's cell door. He described it as "a waterfall of sparks" that were "flying under my door, underneath my oxygen machine, and there were clouds of – of particles coming in." (Smart Depo. at 36 lines 4-5, 8-11, Doc. 30-2 at 11.) He stated that his oxygen concentrator was running at the time, the quantity of dust created was copious and coated everything in his cell, and windows in both HSUs had been wedged shut from the outside for some time. (Smart's Disclosure Stmt, Doc. 25 at 1.)

    Mr. Smart tried to get the attention of the individual doing the grinding but he could not hear Mr. Smart over the grinding. (Smart Depo. at 36, lines 21-23, Doc. 30-2 at 11.) After about 20 minutes he got the attention of a couple officers and they took one look at him and said, "We've got to get you the hell out of here." (Id. at 37, lines 1-5, Doc. 30-2 at 12.) At this time, Mr. Smart's fingers were turning blue. (Id. at lines 6-7.)

    Greg Frazer was not on duty on HSU-2 B on August 12, 2014. (SUF at ¶ 18.) Sgt. Foster was in the sergeant's office at the time of the incident, but that

office does not have a direct line of sight to Mr. Smart's cell. (SUF at ¶ 17.) Mr. Smart, however, heard the officers tell Sgt. Foster that they had to take Mr. Smart out of his cell because it was causing problems for his breathing. (Smart Depo. at 50 lines 4-7, Doc. 30-2 at 17). Sgt Foster looked out of the sergeant's office and nodded to the officers. (Id. at line 17.) The officers left Mr. Smart out of his cell until his lips were no longer blue. They asked if he wanted to go to the infirmary and he said he could breathe now. (Id. at lines 19-23.)

Two days later, on August 14, 2014, Mr. Smart was returning from the library and observed a maintenance vehicle parked outside of HSU-2. (SUF at ¶ 22.) He told Officer Frazer about the removal of the table on August 12, 2014 and how it had damaged his voice. (SUF at ¶ 23.) Officer Frazer rolled his eyes at Mr. Smart and told Sgt. Foster that Mr. Smart wanted to stay off of HSU-2 B while the table was installed. (SUF at ¶ 24.) Sgt. Foster said "[p]ut him in his cell. We'll deal with it when the time comes." (SUF at ¶ 25.) Mr. Smart testified that Sgt. Foster knew that he had been on oxygen for years. (Smart Depo. at 55 lines 16-18, Doc. 30-2 at 19.)

The maintenance workers started installing the table in the center of the day room about 12 feet from Mr. Smart's cell. (SUF at ¶ 28.) The base of the table being installed was a square metal piece with four holes for 1/2 inch Hilti anchor

8

bolts, approximately four inches in length. The individual who installs the table first pre-drills a hole, approximately four inches deep, one at each hole in the table base. The drill bit pulls out pulverized concrete particles and deposits them above the perimeter of the hole. This leaves the concrete particles around the base of the table. Normally, the installing worker has to wipe the concrete particles away, so that they do not fall back into the holes and prevent the anchor bolts from fitting securely. Once the holes are drilled, the remainder of the installation is a non-mechanized process. The worker then takes one of the anchor bolts and pounds it into a hole, with a hammer. Once the bolt is fitted into a hole, the worker tightens the anchor bolt with a wrench or ratchet. Normally, during the hammering and tightening process there is no displacement of concrete particles. On a normal installation, it takes longer to insert the anchor bolts than to drill the holes directly into the concrete. Normally, it takes approximately five minutes to completely install the four anchors that secure the base of the table, inclusive of drilling, hammering and tightening. The alleged installation on August 14 did not involve welding, sparks, the use of a grinder or the use of a disc cutter. (SUF at ¶ ¶¶ 33-47.)

    Mr. Smart heard the grinding noise and saw little bits of dust coming through and he looked over and saw the maintenance working drilling a hole and


concrete dust was flying everywhere. He laid down on his bunk and covered his face. (Smart Depo. at 61 lines 13-14, Doc. 30-2 at 24.) This went on for 20-25 minutes. (SUF at ¶ 32.)

Mr. Smart alleges he watched the maintenance worker drilling holes into the concrete floor, but he did not observe how the anchor bolts were actually installed. (SUF at ¶ 31.) Mr. Smart alleges that the maintenance worker was not wearing a mask or breathing apparatus. (SUF at ¶ 36.)

Officer Frazer was not aware of the manner in which the ADA table would be installed on August 14, 2014 and he did not observe the installation of the ADA table on August 14, 2014. (SUF at ¶¶ 53, 54.)

### III. ANALYSIS

####   A.  Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment imposes duties on prison officials to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (citation omitted).

Establishing an Eighth Amendment violation requires a two-part showing.

First, an inmate must show objectively that he was deprived of something "sufficiently serious." *Farmer*, 511 U.S. at 834. A deprivation is sufficiently serious when the prison official's act or omission results "in the denial of 'the minimal civilized measure of life's necessities.' " *Id.* (*quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "[R]outine discomfort inherent in the prison setting" does not rise to the level of a constitutional violation. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2006); *see also Hudson*, 503 U.S. at 9. In a case alleging improper exposure to some harmful substance, the plaintiff must show that he is personally "being exposed to unreasonably high levels" of the substance. *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A court must consider whether the risk that the prisoner complains of is one "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* at 36.

Second, the inmate must make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834 (*citing Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)); *see also Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. Instead, in order to state a claim for a violation of the

Eighth Amendment, a plaintiff must allege facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm to the plaintiff. *See, e.g., Farmer*, 511 U.S. at 847.

The Court finds that Mr. Smart's evidence fails on both prongs. First, there is insufficient evidence to establish that the 20-25 minute exposure to dust from the drilling of four holes in the concrete 12 feet away from Mr. Smart's cell while he was in his cell with his face covered was sufficiently serious to rise to the level of a constitutional violation. There is no evidence that Mr. Smart suffered any additional adverse reaction to the events on August 14. There is no indication that he even requested medical attention after the second incident.

With regard to the second prong, Mr. Smart has not presented sufficient evidence to establish that Defendants were deliberately indifferent to that risk. The Court agrees with Defendants' assertion that the August 12 table-removal does not constitute prior knowledge of the circumstances of the August 14, table installation. The removal of the old table and installation of a new table were two distinct acts, involving two different types of tables, using different tools and different techniques. (SUF at ¶¶ 45-48.) While the table removal done on August 12, 2014 was done right outside Mr. Smart's cell, it is undisputed that the table installation on August 14, 2014 was approximately 12 feet away from his cell.

While the incident on August 12, 2014 involved grinding and welding which produced sparks and significant amounts of dust, the installation on August 14, 2014 only involved drilling at most four holes in the concrete.  While dust may have been produced during the installation of the table there is no evidence to suggest that Defendants knew that the installation of the table on August 14 would involve a substantial risk of serious harm to Mr. Smart.

There is simply insufficient evidence to establish that Defendants were deliberately indifferent to Mr. Smart's safety on August 14, 2014.  As such, Defendants' motion should be granted.

### B. Equal Protection

The Equal Protection Clause requires, generally, that similarly situated defendants be treated similarly. *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  An equal protection claim may be established by showing that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class, *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Mr. Smart raised no allegation and presented no evidence to establish that

he was intentionally discriminated against or treated differently from other inmates. His equal protection claim should therefore be dismissed.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1. Defendants' Motion for Summary Judgment (Doc. 28) should be GRANTED and this matter DISMISSED. The Clerk of Court should be directed to close the case and enter judgment in favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

2. The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith. No reasonable person could suppose an appeal would have merit.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[3] 28 U.S.C. § 636. Failure

---

[3] Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)." Therefore, since Mr. Smart is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.

to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 4th day of October, 2017.

                             */s/ John Johnston*
                             John Johnston
                             United States Magistrate